Caryl Antony Vaughn GIBBS, the Orion Insurance Company, Young Brothers Limited and Dillingham Tug & Barge Corporation, Plaintiffs,

v.

GRACE BROTHERS, LIMITED, Defendant and Counterclaim Plaintiff,

MATSON NAVIGATION COMPANY, INC., a Hawaii corporation, and Continental Insurance Company, a New Hampshire corporation, Plaintiffs,

v.

GRACE BROTHERS, LIMITED, Young Brothers, Limited, and Dillingham Tug & Barge Corp., Defendants.

Howard ROSIN and Wendy Rosin, Plaintiffs,

v.

GRACE BROTHERS, LIMITED, et al., Defendants.

PACIFIC INSURANCE COMPANY, LIMITED, a Hawaii corporation, et al., Plaintiffs,

v.

GRACE BROTHERS, LIMITED, et al., Defendants.

CHUN KIM CHOW, LTD., a Hawaii corporation, Plaintiff,

v.

GRACE BROTHERS, LIMITED, et al., Defendants.

FOODLAND SUPER MARKET, LTD., Plaintiffs,

v.

YOUNG BROTHERS, LTD., and Grace Brothers, Ltd. and Dillingham Tug & Barge Corporation, Defendants.

Nos. 83–0279, 83–0859, 83–1206, 83–1227, 83–1232 and 83–1268.

United States District Court, D. Hawaii.

July 15, 1986.

John R. Lacy, Honolulu, Hawaii and Forrest Booth, San Francisco, Cal., for plaintiffs.

Hoddick, Reinwald, O'Connor & Marrack, James R. Moore, Honolulu, Hawaii and George W. Ashford, Jr., Laura J. Sasaki, Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRICE, District Judge.

These consolidated actions came on for trial (Phase I) between July 16, 1985, and August 2, 1985, pursuant to order of this Court of July 16, 1985, which bifurcated the trial issues. In this Phase I, the liability issues for the DTB–40 fire, as framed in the complaint and counterclaim in Admiralty 83–0279, include the legal responsibility, if any, of plaintiffs Young Brothers, Limited and Dillingham Tug & Barge Corporation on the one hand, and defendants Grace Brothers, Limited, on the other hand, to each other and/or to other cargo claimants in these consolidated actions.

In their complaint (In Admiralty 83–0279), filed herein on March 11, 1983, plaintiffs seek damages from cargo shipper defendant Grace Brothers, Limited (hereafter Grace), arising from a November 20, 1982 fire aboard the barge DTB–40, while under tow of the tugboat Mikioi during a voyage from Honolulu, Hawaii to Nawiliwili, Kauai. Plaintiffs claim that the fire was caused by defendant's hot asphalt pontoons which defendant shipped aboard DTB–40 on the subject voyage. Plaintiffs' claims are based on negligence, strict liability and breach of warranty. In its answer of April 21, 1983, Grace sets up the defenses of: (1) failure to state a claim upon which relief may be granted; (2) negligence of the carrier Young Brothers and the tower Dillingham Tug & Barge Corporation (hereafter DT & B); (3) assumption of risk by the carrier and tower; and (4) consent by the carrier and tower to the shipment of asphalt pontoons.

Grace filed a counterclaim in this action on April 21, 1983 which seeks damages against plaintiffs for loss of its asphalt pontoons and punitive damages based upon theories of negligence and breach of a contract of cargo insurance. In this Phase I of the trial, the Court considers all of the foregoing claims except defendant's claim for breach of a contract of insurance, which shall be considered in Phase II of the trial of these actions. Cargo claimants in the other consolidated admiralty actions have agreed to be bound by the judgment of this Court resulting from the trial of Phase I insofar as which, if any, of Grace Brothers, Young Brothers and DT & B are liable to them for damages provable in the Phase II trial of these actions.

Based upon the evidence adduced at Phase I of the trial, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiffs, Young Brothers, Limited (hereinafter "YB") and Dillingham Tug & Barge Corporation (hereinafter "DTB"), are subsidiary companies affiliated with Dillingham Maritime Pacific. The plaintiffs Caryl Antony Vaughn Gibbs (hereinafter "Gibbs") and Orion Insurance Company (hereinafter "Orion"), are the insurance underwriters for YB and DTB.

2. The defendants Grace Brothers, Limited (hereinafter "Grace") are asphalt contractors operating in the State of Hawaii and elsewhere in the Mid-Pacific area.

3. All of the events detailed by these findings of fact took place on the land area which constitute the District of Hawaii or the navigable waters adjacent to such land area.

4. YB operates barges that convey freight from YB's terminal and docks situated in the City of Honolulu, on the island of Oahu, to the other islands of Hawaii (hereinafter referred to as the "outer islands") constituting the District of Hawaii. On the occasion giving rise to this litigation, the barge known as the YB–40 was owned and operated by YB, and was being towed by a tug owned by DTB, known as the Mikioi. At some point prior to the shipment in question, and not definitely fixed by the evidence, YB began assem-

bling freight consigned to it for shipment to the outer island of Kauai.

5. On November 19, 1982, after incoming freight had been off-loaded, YB's personnel began loading the assembled freight onto the YB-40 for shipment to Nawiliwili Harbor, Lihue, Kauai. This voyage will hereafter be referred to as "Voyage 53".

6. In preparation for the on-loading, YB's personnel developed a freight list and hazardous cargo manifest. The load list (plaintiff's Exhibit 42) is simply a list of the separate items that had been assembled for carriage by the YB-40 to its destination on Kauai. The hazardous cargo manifest (plaintiff's Exhibit 28) indicates that the following hazardous cargo was on-loaded for shipment on the YB-40: 1 cage of mixed cylinders of liquified propane; 16 cylinders of acetylene; 2 cylinders of methylaostylene propadiene; 10 cylinders of monochlorodifluoroesethane; 5 cylinders of compressed nitrogen; 1 cylinder of compressed banana gas; 1 cylinder of compressed carbon dioxide liquified; 24½ pint cans of liquid cement; 24-1 pint cans of liquid cement; 3 cartons of liquid cleaning compound; 32 packages of corrosive materials; 3 cartons of 60 each of fuel system cleaner; 8 gallons of PVC cement; 1 bottle of chloroform; 1 skipload of acetylene; 1 electric storage battery; 1 carton of flammable solids; 93 cartons of petroleum lubricating oil. These items were stowed on board during the day of November 19, 1982, along with the rest of the general cargo.

In addition, a substantial number of automobiles were loaded, each with an undetermined amount of gasoline in each tank and its electrical systems intact.

From the freight list, Segundo Facuri (hereinafter Facuri), the loading supervisor for YB, prepared a load plan which he distributed to the YB employees engaged in on-loading the freight to the barge as a general guide for loading the barge. The loading plan was not followed precisely, but is merely an outline as to the general location where Facuri desired the various items of freight to be placed.

7. Normally the freight is assembled in YB's warehouse and transported to the dock for on-loading. All of this freight, of course, is listed on the freight list which is used by Facuri in making up the loading plan. In addition, some freight is brought directly to the dock during the on-loading process and is never made a part of the pre-planned loading plan. One cannot accurately fix the position of any cargo on the barge from the loading plan.

8. Facuri does not receive a copy of the hazardous cargo manifest. He relies solely on the labels attached to the freight itself. Facuri is mainly concerned with cylinders used to ship compressed gasses and is generally familiar with the various labels employed on such cylinders. Facuri had never received any special instructions regarding the loading or handling of hazardous cargo.[1]

Neither was the master of the tug Mikioi furnished with a copy of the hazardous manifest.

Facuri looks at the hazardous cargo in the same manner as general cargo, i.e., that which will likely sustain weather damage is loaded under the deck house; that which will probably not be damaged by weather is loaded aft on open deck.

9. Among the items shipped on the YB-40 on the voyage in question were 16 pontoons of hot asphalt contained in 4 flat racks. Because of the weight of the flat racks, they were placed on or near the midline of the barge (a line approximately down the middle of the barge stretching from the bow to the stern) and in the open deck area just aft of the deck housing that covered the approximate forward half of the barge. This cargo was not listed on

---

1. 49 CFR 176.13 provides as follows:
   Unless this subchapter specifically provides that another person must perform a duty, each carrier, including a connecting carrier, shall comply with all applicable regulations in this part, and shall thoroughly instruct his employees in relation thereto.

the hazardous cargo manifest. Grace was the shipper of this cargo.

10. Shipping hot asphalt from the Port of Honolulu to the outer islands is a common practice in the District of Hawaii.[2] The business rationale for shipping asphalt in a heated condition is that such a shipment can be discharged from the container promptly on arrival at the outer island, and the container promptly returned to Honolulu for further use.

11. Prior to the construction of the pontoons in question, Grace and their principal competitor, Hawaiian Bituminals (hereinafter "HB"), also a Dillingham affiliate, used steel tanks on wheels to make overwater shipments of heated asphalt. These wheeled tankers were covered by fiberglass insulation and plywood. Since these tanks occupied a large space on the deck of the barge, and as cargo shipping was evolving to shipment in containers of standard dimensions, other methods of shipment were thought to be necessary for purposes of economy and ease of handling.

Evidence was introduced that prior to the voyage at issue here, a smoldering fire was discovered by YB personnel in the plywood covering of a HB Trailer after it was loaded onto a YB barge, but before the voyage commenced. The testimony is in conflict as to whether this fact was communicated to Grace personnel.

There is no dispute, however, that YB continued to accept plywood covered containers of hot asphalt for shipment after this incident occurred.

12. Grace was awarded a government contract on Kauai which necessitated the shipment of large amounts of asphalt to Kauai to complete that job. This prompted Grace to develop the pontoons in question. The ultimate design of the pontoons was developed in consultation with the fabricators Busby Bros. and YB personnel.

13. Busby fabricated the basic steel container itself from drawings and specifications in consultation with Grace personnel. When completed, these steel containers were shipped to Grace. The exterior application of plywood and fiberglass insulation was made by Grace personnel. The decision to use plywood and fiberglass insulation to afford protection from the heated steel pontoons was likewise made by Grace personnel without consultation with experts in the field.

14. The steel container that contained the asphalt was in the shape of a block, having the outside dimensions of five feet seven and one-half inches by seven feet one and one-quarter inches by seven feet ten inches (5'7½" x 7'1¼" x 7'10"). Affixed to the top and four sides of this steel vessel were one and one-quarter inch by one and one-quarter inch (1¼" x 1¼") steel tubes. A manhole was located at the top for filling the pontoon and an exit valve was inserted at the bottom for draining the hot asphalt. This container sat on two steel tubes incorporated into the structure for use when being transported by fork lifts.

Affixed to the top and the four sides of the pontoon between the one and one-quarter inch steel tubes was fiberglass insulation. Affixed to the exterior of the one and one-quarter inch tubes, by five-sixteenth inch by one and one-quarter inch (⁵/₁₆" x 1¼") bolts, were sheets of three-quarter inch (¾") plywood, which formed the exterior shell of the pontoon. There were not ribs on the bottom of the container. Neither was there fiberglass insulation or plywood on the bottom of the pontoon.

15. When in place, and loaded on the YB–40 barge for transit, three such pontoons were placed on each flat rack. The floor of the flat racks upon which these pontoons were placed was made of hardwood. The rest of the flat rack was made of steel.

16. In preparation for loading, the pontoons were filled with hot asphalt at three hundred ninety-six degrees (396°) F. After filling, the pontoons were delivered directly

---

**2.** 23,000 to 35,000 tons of hot asphalt are moved to the outer islands from Honolulu each year in   the manner employed on this occasion.

to the dock for loading. The shipment at issue was filled at 396° F.

17. An experiment conducted for purposes of presentation at this trial indicated that when two (2) pontoons identical to those employed in the shipment relevant to this case, are filled with hot asphalt at 396° F. temperature and placed side by side, surrounded by outside (ambient) temperature ranging from 71° to 73° F., the temperature of the asphalt will fall by precisely 2° per hour. This test was conducted by Dr. Zicherman, See Finding No. 28.

During the outbound voyage the temperatures were not recorded in the bridge log book by the crew of the Mikioi. However, rain storms were encountered during a significant portion of the voyage.

18. The testimony establishes that the pontoons were filled with asphalt during the working hours of Friday, November the 19th and were promptly transported to YB's Honolulu terminal and docking area. The pontoons in question were filled with hot asphalt between 5:55 a.m. and 12:25 p.m. on November 19, 1982. Immediately after filling they were delivered to YB's terminal and dock on flat rack trucks. Three pontoons were placed in each of the loading racks used to transport them.

Of the pontoons in question, one (1) had been used three (3) previous times, five (5) had been used twice previously, two (2) pontoons had been used once previously and seven (7) of the pontoons had not been used previously. The average time the hot asphalt is retained in the pontoons is thirty (30) hours on each trip. However, if rain or other weather conditions intervene, the period can be lengthened significantly.

Although the records kept by Grace on the use of these pontoons are not as precise as might be desired, the Court finds that the foregoing testimony is generally reliable as to the extent of the use of the pontoons in question.

19. The DTB–40, the barge in question in this litigation was two hundred eighty six (286) feet in length, seventy eight (78) feet in width and eighteen (18) feet deep.

The barge had a flat deck, the forward half of which was covered with a deck house approximately twenty eight (28) feet high. The deck house was constructed of steel girder framework which supported the sides and roof. The sides consisted of a metal bulkhead for the first nine (9) feet up from the deck with plywood siding above that. The front wall of the house was sheet metal. The first sixteen and one-half (16½) feet of the roof aft from the bow was sheet metal with the rest being constructed of four by eight (4 × 8) plywood sheets, three-quarter (¾) inch thick. The deck house was completely enclosed in the front, sides and top and the aft remained completely open.

20. Situated on the deck of the barge, contained in a standard twenty (20) foot shipping container with two hinged doors at one end, is a diesel generator referred to by some of the witnesses as a "power pack", which term will be used hereafter when referring to the generator. In addition to the hinged doors at one end of the modified container, louvers had been cut in the sides of the container in order to provide ventilation to the power pack. The power pack consisted of a Detroit diesel 671T engine driving a 220 KW generator. The power pack was fueled by a 500 gallon plus fuel tank also contained in the modified container.

The generator fed a service panel of electrical receptacles in which reefer cords were plugged. These reefer cords were strung from the power pack to energize the seven (7) refrigerator vans loaded aboard the DTB–40 for the voyage. Some of the reefer cords were strung through the open doors of the modified container housing the power pack.

21. After the loading was completed, Facuri gave the barge a final check before sailing time. He testified that when he happened by the generator container described in Finding No. 20 above, he noted that the right hand container door was tied open with twine.

22. Abraham Barcelona is a mechanical service man in the employee of YB. His

principal job is to maintain and repair YB's mechanical equipment including the electrical equipment on the barges. He also served as the "late man" on the barge who is the last man employed by YB to work on the barge prior to its sailing. As a late man, the tasks which he completes are:

(1) To ballast the barge, i.e., to pump water into the ballast tanks until it is level.

(2) Make a final check of the reefers and the generator engine.

(3) Record the readings of the interior temperatures of the reefers.

He testified that as he left the barge he came by the container door in which the power pack is housed and noticed that the door was tied open with twine attached to either the bridge or a piece of lumber placed between the I beams welded to the deck to protect the power pack and reefers from being damaged in the placing of freight containers onto the barge. He had no occasion to do any work around the generator that day other than to make a final check of the engine and record the appropriate reading.

Barcelona testified that he could have earlier told Robert Lowe, the fire investigator retained by YB and Dillingham, who ascertained the probable origin of the fire, that the generator door was open and unsecured.

23. Captain Dwight Shields, Jr., was the master of the tugboat Mikioi. Shields has held a masters license continuously since 1962. His license permits him to serve as master for vessels of two hundred ninety nine (299) tons or less which are not inspected and his license is good for any ocean.

As previously indicated the Mikioi with Shields in charge and DTB–40 in tow left pier 27 at 1745 hours. The crew, in addition to the master, consisted of A. Holt, J. McDiarmid, J. Silva, R. Watanabe, F. Young, T. Mugford, M. Naone, and R. Suzuki. Shields completed the 1600 to 2000 hours watch outbound from Honolulu and turned in. The ship's log entries prior to the fire reflect the following:

2000 hours—visibility six (6) miles, winds from the northeast one to two (1 –2);

2200 hours—visibility six (6) miles, light air;

0200 hours—visibility nil, wind in northeast.

All entries indicate the sky to be OP.

The ship's log indicates the fire was discovered on the barge at 0510 at a time when very heavy rains were falling. The fire was noted by the glow reflecting against the overcast sky. Upon noting the fire, Captain Shields did the following things, although not necessarily in the order stated:

(1) He radioed the Coast Guard Station at Nawiliwili Harbor in Kauai.

(2) He summoned the crew and ordered them to lay out the fire hoses.

(3) He altered the direction of the barge so that it would be headed directly into the wind and away from the entrance to Nawiliwili Harbor.

(4) He shortened the tow line extending between the tug and the barge so that he could position the aft end of the barge in such a position that it could apply water to the fire on the barge.

According to Captain Shield's estimate the foregoing required approximately twenty (20) minutes and by 0530 hours the tug was along side the barge and pouring water on it.

The crew testified that as the tug approached the barge the fire appeared to be in the open deck area immediately behind the after end of the deck house on the barge. All agreed that despite the fact that the barge was headed into the wind, the fire was creeping forward and involving cargo under the deck house.

The crew was not in agreement as to the precise points—port to starboard—where the center of the fire appeared to be located.

At approximately 0600 hours, Captain Shields noted in his log that the fire came through the top of the deck house approximately one-third (⅓) of the length of the

house from the bow of the barge. Captain Shield's testimony made it quite clear that these times were not precise as he did not interrupt his fire fighting procedures to make appropriate entries.

24. The log does not specify how many sightings were made of the barge during the outbound trip from Honolulu Harbor to the point where the fire was first sighted. The log does reflect that the visibility varied throughout the voyage and that further, the testimony was that the barge does not always follow the tug in a straight line. Depending upon the relative position of the tug and the barge, it is not always possible to see the barge either with the naked eye or with binoculars unless the person making the observation leaves the wheel house and steps on to the deck of the tug.

25. Chief Engineering Officer Robert Watanabe stood the 0400 to 0800 engine room watch. On the morning that the fire was discovered, he was awakened at 3:30 and went to the galley to get a cup of coffee. After performing his standard routine in the engine room, he then went into the galley to pour coffee. He smelled smoke that he described as electrical smoke on the starboard side of the galley. He noted that the starboard water tight door was closed. He went to the port side of the galley and could not smell smoke. Watanabe returned to the starboard side of the galley and smelled smoke. Watanabe immediately went to the deck house and reported to the Captain about his smelling smoke. Captain Shields told him to take a look at the barge and he saw a glow against the sky. Watanabe briefly viewed the fire from the deck leaving his station in the engine room. When he first saw the fire the fire was coming out from the aft end of the roof. Watanabe, as the other witnesses, could not accurately fix the time of his observations.

26. By approximately 0630 hours it became apparent to Shields that the efforts of the fire fight by the crew of the tug Mikioi would be of no avail and, because the cargo was exploding on the deck of the barge, he determined that further efforts

in this regard would not be of any help. Captain Shields then contacted the office of his employer in Nawiliwili Harbor by radio and was instructed to tow the burning barge back to Honolulu. As they approached the mouth of the harbor at Honolulu, they were met by fire boats from the Honolulu Fire Department until it was determined that the fire was out and it was safe to pull the barge into the harbor. All of the cargo that had been loaded on the barge was totally lost.

27. The only person other than the members of the tug Mikioi that was able to experience a close up view of the fire on the barge was Petty Officer McAdams, United States Coast Guard, who was second in command of the Coast Guard Station at Nawiliwili Harbor, Kauai. He was called by the duty person and immediately departed for the base. On arrival he was told that there was a barge on fire approximately four to five (4–5) miles off the entrance of Nawiliwili Harbor. A station log indicated that McAdams and a crew were underway to the barge by 0610 hours.

The assignment of McAdams and his crew was to assess the fire and attempt to put it out. He had been advised there were no persons aboard the barge.

After they were under way, McAdams observed the barge on fire four to five (4–5) miles southerly from Nawiliwili. He was in an open cockpit type boat which had a canopy and a windshield with the sides and back open. He described the wind as being northerly, maybe north—northeast. All during the time they had the barge and tug in view, they were headed into the wind. The sky was dark and there was intermittent rain. By 6:30 they were one (1) mile away and at 6:40 they were on the scene. As they approached the barge McAdams noted that the house was aglow. From a mile away he and his crew could only see the brilliance of the flames, they could not detect the fire's exact location. When they were on the scene, McAdams saw flames thirty five (35) feet high above the house itself. As they approached the port side bow of the barge McAdams noted

that the barge was being towed at full length from the tug. They then moved to the starboard side of the barge and stood off because they could not get close enough to reach the fire with their fire fighting equipment. The fire was so hot it would have scorched the paint on their ship at three hundred (300) feet. By this time the flames were coming through the roof of the deck house leaving only the steel rim. The fire was concentrated in the house and moving aft from the house toward the after end of the barge. Cars were on fire which were loaded on the deck on the starboard side of the barge. The Coast Guard crew moved from that position because they could feel the concussions from the explosions taking place on the deck. They maintained a position of approximately one-half (½) mile from the barge to stay out of danger. At some point they heard the radio transmission directing the tug to return to Honolulu with the barge.

During the time they were on their mission, their distance from the barge varied from one hundred (100) yards to one-half (½) mile. During the time that they were in contact with the barge, they noted that the house on the barge became fully engulfed in the fire and that thereafter the fire moved aft of the house over the rest of the barge.

At 0735 hours they were directed to leave the scene and return to the base. Prior to this they noted that the fire had consumed approximately three-quarters (¾) of the barge deck. McAdams was certain that when he first observed the barge, the fire was contained entirely within the deck house and that further the deck house was fully enveloped in flames before the flames were observed to move to the after end of the barge from the deck house.

27a. The fire investigation "expert" produced by YB, Robert Lowe, came to Hawaii on November 26, 1982. He first boarded the barge on Saturday, November 27, 1982. He stayed in Hawaii for 5 days during this first trip. He returned on December 8, 1982 and stayed for two days.

He interviewed the crew of the tug and other YB and DTB employees. In combining their statements with his visual observations he concluded that the Grace pontoons were the only source of the fire, and that after the charred wood produced an ember, which then produced flame, the fire spread upward and both fore and aft. He discounted as incorrect the testimony of Chief Watanabe and Petty Officer McAdams. Having arrived to his personal satisfaction as to the source of the fire, he testified as to the origin of the burn.

Lowe was never furnished with the cargo manifest or the hazardous cargo list.

Lowe based his hypothesis in large part upon his experience with the Los Angeles Fire Department—i.e., a high incidence of fires occurred when the weather turned wet and cold and floor furnaces were activated, causing fires in the wood adjacent to the heaters.

Lowe has no training in chemistry.

28. Doctor Joseph Zicherman, a Ph.D in wood science and technology, testified that microscopic examination demonstrated that none of the plywood exposed to the heated surfaces of the pontoons, i.e., at the channel supports or the screw-holes, showed charring as opposed to merely becoming darkened. Dr. Zicherman testified that wood conducts heat cross grain, hence the temperatures of the asphalt and the plywood covering would never be in equilibrium. Further, wood does not contain sufficient oxygen to cause a charred ember to flame. Hence, the Love theory that the source of the fire was in the interior sides of the pontoons—i.e., the sides next to each other—is not plausible.

29. Grace produced Robert Brenner who was qualified as an "expert" in fire investigation. He was retained in 1984 by the defendants. He never saw the barge in its burned condition. He based his testimony on the pictures and other documentary evidence, much of which has been introduced in evidence in this trial and on many of the depositions that were taken pre-trial. He recommended that Grace hire Doctor Zicherman, a chemist and an electrical ex-

pert. Only one of his recommendations in this regard was followed.

Brenner formed his opinion as to the probable source of the fire only after he reviewed Dr. Zicherman's test on the pontoons. He was of the opinion that the source of the fire was in the area of the power pack. He came to this conclusion on the basis of:

(a) Dr. Zicherman's work;

(b) The area around the power pack showed the greatest damage, indicating a greater fire intensity;

(c) This area contained the greatest number of potential ignition sources; and

(d) The rain during the voyage substantially reduced the possibility that the fire started on the open deck of the barge as opposed to the protected area under the deck house.

Using a series of photos, many of which were taken by Lowe, Brenner traced the path of the fire from its origin and from the almost total destruction of the cargo under the deck house to the aft section of the barge where he found the fire damage to be less complete. This he correlated with a well recognized theory that objects generally fall in the direction that the flame travels. He felt that the photos he identified during his testimony illustrated his hypothesis.

29a. Captain Henry Kim, Chief Fire Investigator, a veteran of 27 years with the Honolulu Fire Department, testified that he was asked to board the barge on November 23, 1982 to assist the Coast Guard. It was his opinion that the destruction on the barge, which resulted from the free burn on the voyage back from Kauai, was so complete that there was no way of telling where the fire started, its probable source, or how long it had burned before discovery.

30. Captain Paul Young, a 15 year veteran of the Honolulu Police Department, and presently a fire investigator with that department, felt that the most damage to the barge and its contents was in the area of the bow, which would indicate the proba-

ble point of origin. However, he could not determine the cause of the fire, and expressed no opinion on the same.

31. The weather conditions prevailing during the voyage would make the area protected by the deck roof as the most logical place for a smoldering fire to burst into flames. The wind conditions prevailing would logically cause the fire to move to the aft portion of the barge more rapidly than toward the forward portion of the barge.

32. The fire on the barge burned freely from its inception until met by the fire boats off Honolulu Harbor. Thus, the "area of complete burn", i.e., an area where all combustible materials are consumed, is a less dependable indicia of the point of origin of the fire than would be true if the fire was attacked promptly upon discovery by properly equipped firefighting personnel and equipment.

## CONCLUSIONS OF LAW

■ A. Plaintiff did not establish the original location of the fire, or its sole or contributing source as required by law. The evidence would equally support a conclusion that the fire started in three possible places and from two possible causes.

■ B. Defendant Grace Brothers established by a preponderance of the evidence that Young Brothers personnel did not exercise the requisite standard of care in the loading of the cargo, the segregation of hazardous materials, and the protection of electrical conduits from damage. However, defendant Grace Brothers did not establish by a preponderance of the evidence that any negligent act or acts of Young Brothers was a proximate cause or even a contributing cause of the fire.

C. Defendant Grace Brothers is entitled to judgment on plaintiff's complaint, cross-defendants are entitled to judgment on Grace Brothers' cross-complaint. All parties' entitlement to costs shall be determined by post-trial motions.

D. Counsel for the defendant is ordered to prepare a judgment consistent with

these findings and conclusions and submit the same to the Court within twenty (20) days of the filing of these findings. Counsel for the plaintiffs shall have ten (10) days to object to the form of the proposed judgment.

E. Any finding of fact that may be deemed to more properly be stated as a conclusion of law will be deemed such. Any conclusion of law that is deemed to be more properly a finding of fact shall be deemed such.